J-S10031-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.W.C., A/K/A/ Z.T.W.-C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: B.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3295 EDA 2017 |

Appeal from the Order Entered September 7, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0000845-2017,
CP-51-DP-0002202-2014

BEFORE: BOWES, J., OLSON, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED APRIL 06, 2018**

Appellant B.W. (Mother) appeals from the order involuntarily terminating her parental rights to her daughter Z.W.C., who was born in August 2010 (Child).[1] Mother claims that the Department of Human Services (DHS) failed to produce clear and convincing evidence that termination was warranted under 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). We affirm.

We adopt the facts and procedural history set forth by the trial court. *See* Trial Ct. Op., 11/21/17, 1-21. For purposes of a brief background, we reiterate that Child was placed in the care of DHS on September 17, 2014, found dependent on September 26, 2014, and briefly reunited with Mother

_____

[1] DHS also petitioned to terminate the parental rights of R.B.C. (Father), which the trial court granted. Father did not appeal from the termination of his parental rights.

from March 15 to March 24, 2016. However, Child was returned to DHS's custody on March 24, 2016, after Mother missed medical appointments for Child, a mouse and roach infestation was discovered at her home, and Mother failed to use medical equipment provided for Child. Child has significant medical needs due to cerebral palsy and a history of meningitis. Child is dependent on a gastrostomy tube for feeding and has a ventriculoperitoneal shunt.

DHS filed its petition to terminate Mother's parental rights on August 23, 2017. The trial court appointed legal counsel for Child. On September 7, 2017, the trial court granted the petition pursuant to 23 Pa.C.S. § 2511(a), (1), (2), (5), (8), and (b). On October 5, 2017, Mother contemporaneously file a timely notice of appeal and Pa.R.A.P. 1925(b) statement.

Mother raises the following issues for our review:

1. Whether the trial court erred by terminating the parental rights of [M]other pursuant to 23 Pa.C.S.A. sec.2511(a)(1) without clear and convincing evidence of [M]other's intent to relinquish her parental claim or refusal to perform her parental duties.

2. Whether the trial court erred by terminating the parental rights of [M]other pursuant to 23 Pa.C.S.A. sec.2511(a)(2) without clear and convincing evidence of [M]other's incapacity to perform parental duties.

3. Whether the trial court erred by terminating the parental rights of [M]other pursuant to 23 Pa.C.S.A. sec.2511(a)(5) without clear and convincing evidence to prove that reasonable efforts were made by Department of Human Services to provide [M]other with additional services and that the conditions that led to placement of the [C]hild continue to exist.

4. Whether the trial court erred by terminating the parental rights of [M]other pursuant to 23 Pa.C.S.A. sec.2511(a)(8) without

clear and convincing evidence that the conditions that led to placement of the [C]hild continue to exist when mother presented evidence of compliance with the goals and objectives of her family service plan.

5. Whether the trial court erred by terminating the parental rights of [M]other pursuant to 23 Pa.C.S.A. sec.2511(b) without clear and convincing evidence that there is no parental bond between [M]other and [C]hild and that termination would serve the best interest of the [C]hild.

Mother's Brief at 7.

Mother first argues that DHS failed to present clear and convincing evidence to support the trial court's termination of her parental rights under Section 2511(a)(1). Mother's Brief at 11. She claims that she completely satisfied the goals and objectives of the single case plan (SCP), which led to reunification in March of 2016. *Id.* She further claims that "[a]fter [Child] was recommitted to DHS and returned to Pedia Specialty Care based on the roach infestation in the family home, [M]other exterminated the property completely." *Id.*

Additionally, Mother argues that after Child was returned to DHS custody, her ability to visit "was compromised by [the Community Umbrella Agency's (CUA)] choice of placement at the Pedia Specialty Care location in Doylestown, Bucks County instead of the Philadelphia location." *Id.* Therefore, she concludes that her "inability to completely satisfy the goals and objectives of her family service plan was caused by a lack of reasonable efforts by [DHS] to reunify [C]hild with [M]other." *Id.*

Our standard of review is well-settled:

- 3 -

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations, brackets, and quotation marks omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). Additionally, this Court has explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the

- 4 -

needs and welfare of the child under the standard of best interests of the child.

**In re L.M.**, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Section 2511(a)(1) provides as follows:

**(a) General rule.** The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1).

With respect to Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." **In re Z.S.W.**, 946 A.2d 726, 730 (Pa. Super. 2008). Once this has been established, "the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b)." **Id.**

Additionally,

[t]o be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish

- 5 -

his parental responsibilities bears the burden of proof on this question.

*In re Z.P.*, 994 A.2d 1108, 1119 (Pa. Super. 2010) (alteration in original)

(citation omitted).

While the six months preceding the petition are the focus of this inquiry,

the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of [the parent's] parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted).

With respect to "parental duties," this Court has explained:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

\* \* \*

Because a child needs more than a benefactor, parental duty requires that a parent "exert himself to take and maintain a place of importance in the child's life."

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while

- 6 -

others provide the child with . . . her physical and emotional needs.

*Id.*

Lastly, our Supreme Court has held that Section 2511 does not require an agency to make reasonable efforts to reunite parents and children prior to termination. *In the Interest of D.C.D.*, 105 A.3d 662, 671 (Pa. 2014). Nevertheless, "the provision or absence of reasonable efforts may be relevant to a court's consideration of both the grounds for termination and the best interests of the child." *Id.* at 672.

Here, the trial court concluded that DHS established the requirements of Section 2511(a)(1). The court "found clear and convincing evidence that Mother failed and refused to perform parental duties, failed to address the conditions which brought the Child into placement, and lacks the capacity to adequately provide care and control and a stable environment necessary for this special needs Child." Trial Ct. Op., 11/21/17, at 22. The court based its conclusion on testimony from several witnesses, which established that Mother failed to meet her SCP objectives, as she did not consistently attend mental health therapy, did not secure housing, did not consistently attend Child's medical appointments, and did not maintain consistent visitation with Child. *Id.* at 22-29; N.T., 9/7/17, at 50.

The trial court further addressed Mother's claims of error in its opinion as follows:

> Mother alleges DHS did not meet its burden by clear and convincing evidence, and that the evidence presented was

insufficient to terminate her parental rights. She claims to have achieved some of her objectives and can be a Caregiver to her Child. The Court disagrees, and found clear and convincing evidence that Mother failed and refused to perform parental duties, failed to address the conditions which brought the Child into placement, and lacks the capacity to adequately provide care and control and a stable environment necessary for this special needs Child.

This [c]ourt relied on the credible testimony of two CUA Workers, Case Supervisor, Ms. Rashida Smith and Case Manager, Keisa Walden. Both testified that the SCP objectives for Mother were to maintain visitation, to attend the medical appointments, obtain mental health therapy for herself, and obtain housing.

Ms. Walden noted that Mother did attend Community Counsel for mental health therapy and was consistent at times, however, since April of 2017, Mother has not provided any documentation that she has been attending any type of therapeutic services. Regarding Mother's attendance at medical appointments, she testified Mother has not been consistent. Some appointments occur at CHOP in Philadelphia and others occur in Chalfont in Bucks County. Mother is offered transportation by [Child's] facility, if she is on time at the facility, however, Mother has not offered any reasons as to why she cannot attend the medical appointments consistently. Further, she noted that Mother has remained unemployed and is not attending any type of educational program. Mother lives with Maternal Grandmother. Regarding visitation, Mother has liberal supervised visits at Pediatric Specialty Care, where [Child] has been since May of 2016. Mother has attended 10 visits with [Child] in 2016, and 3 visits thus far in 2017. Mother was also offered telephone and video chat as a means of contact with her Child, however, she has not been consistent with that either.

The [c]ourt also heard pertinent and credible testimony from Stacey Wilson, Social Worker at Pediatric Specialty Care. She stated that parents can visit their children at the facility seven days a week. [Mother] has attended 13 times, 10 were in 2016 and 3 were on 2/18/2017, 4/29/2017 and 7/29/2017. Mother has not visited with [Child] since 7/29/2017. She noted that [Child] had 5 medical appointments in Philadelphia in 2016 and that Mother attended 2. In 2017, [Child] has had 15 appointments thus far and Mother has attended 3 and on the 4th appointment, Mother had to be called and asked to attend. The last time Mother

attended an appointment at CHOP was 6/9/2017, and since that time, [Child] has had 6 appointments. Mother is called by the Social Work Team or the Administration to notify her of the dates and times of appointments.

Finally, the [c]ourt also relied on the expert testimony of Dr. Erica Williams. She testified she conducted the Parent Capacity Evaluations on Mother on May 15, 2017, and noted that [Child] came into care due to Mother's unstable housing and not meeting [Child]'s medical needs. Mother did complete what was asked of her and was reunified with her daughter. However, within one week the concerns were raised again because of Mother not having appropriate medical equipment, not having medications filled and not meeting the needs of [Child]. The deplorable conditions of Mother's home put [Child] at risk and prevented the medical staff from attending to [Child].

Dr. Williams noted [Child] is not able to care for herself in any capacity and also needs medical equipment to sustain her life. She requires medical nursing support as well as constant care by a Caregiver. The Caregiver must be able to respond to any immediate emergency of Trach blockage, flushing it out; feeding her through her feeding tube and meeting all her needs at any given moment. Mother was aware that there were issues meeting [Child]'s medical needs, however she was only able to identify concerns with housing. She did not focus on the concerns that CUA raised which were more serious, the medical needs of [Child] not being met.

Dr. Williams also observed various child-like behaviors by Mother. At one point, Mother closed the sweatshirt she was wearing and spoke through the clothing. Further, she was observed by workers sucking on her toes for comfort. Mother's coping skills are child-like and undeveloped, and she therefore withdraws, or exhibits child-like behaviors. She opined Mother requires individual therapy directly targeting coping skills and how to manage stressors.

Regarding visitation, Dr. Williams noted that Mother was allowed liberal visitation, meaning she could visit [Child] whenever she liked. Mother reported going regularly, however, in speaking with CUA, the fact was that Mother was not visiting [Child] regularly, despite being provided tokens for transportation. She further testified, the issue of visitation is vital in terms of building a relationship, creating a bond in which [Child] can depend on her

- 9 -

Mother to meet her needs. Dr. Williams found it relevant that Mother was choosing not to follow through on even this part-time role. Mother was not present, not practicing the medical skills required, not building the relationship, and not meeting [Child]'s needs. Dr. Williams testified that if Mother was not up-to-date on [Child]'s medical needs and has not demonstrated the skills to deliver the medical care required by a Caregiver, it would be a life or death situation, according to the records that she reviewed. Ultimately, Dr. Williams opined that although Mother presented with various strengths that she could build on, she did not at the time of the PCE have the capacity to provide safety or permanency for [Child].

Trial Ct. Op., 11/21/17, at 22-25 (footnote omitted).

The trial court's conclusion regarding Mother's failure to perform parental duties are supported by the record. *See* N.T., 9/7/17, at 21-26, 44-47, and 60-63. Mother failed to maintain visitation with Child, attend Child's medical appointments, obtain housing, or consistently attend individual mental health therapy. *Id.* Given Child's complex medical needs, it is clear that these failures demonstrate that Mother did not perform her parental duties with respect to Child.

Additionally, the trial court considered the actions of DHS during the life of the case and concluded that it made reasonable efforts to facilitate reunification. *See* N.T., 9/7/17, at 93-96; *see also D.C.D.*, 105 A.3d at 672. This conclusion is supported by the record, which provides ample evidence to support the trial court's determination that DHS made reasonable efforts and, despite being offered those resources, Mother failed to satisfy her SCP goals. *Id.* at 93-94.

Therefore, we find the trial court's determinations under Section 2511(a)(1) are supported by competent evidence, and we discern no basis to disturb the trial court's conclusion that termination was warranted. Accordingly, Mother's first issue warrants no relief.[2]

Mother, in her final issue, contends that there was insufficient evidence to prove that termination was in Child's best interest under Section 2511(b). She further asserts that she "has a strong emotional bond with Child." Mother's Brief at 14. Finally, she concludes that DHS "severely compromised" her ability to visit and bond with Child, and that the agency's failure to make reasonable efforts toward reunification ultimately had a negative impact on Child's well-being. *Id.*

Section 2511(b) states:

> **(b)  Other considerations.** The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S. § 2511(b).

---

[2] In order to affirm a trial court's determination with respect to section 2511(a), we need only agree with the trial court as to any one subsection. *In re B.L.W.* 843 A.2d 380, 384 (Pa. Super. 2004).  Because we affirm the trial court's consideration of Section 2511(a)(1), we need not consider Mother's arguments with respect to the sufficiency of evidence for subsections 2511(a)(2), (5), and (8). *See id.*

Section 2511(b) focuses on "whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1286 (Pa. Super. 2005). This inquiry involves "[i]ntangibles such as love, comfort, security, and stability" and requires the court to "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* at 1287.

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well." *In re Z.P.*, 994 A.2d at 1121 (citations omitted). In addition, "Section 2511(b) does not require a formal bonding evaluation." *Id.* Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008). The parent-child bond is "only one of many factors to be considered by the court when determining what is in the best interest of the child." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quotation marks and citation omitted). "Above all else . . . adequate consideration must be given to the needs and welfare of the child. A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." *In re Z.M.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted).

The trial court here found that DHS demonstrated, through clear and convincing evidence, that termination would best serve the needs of the child. The trial court explained:

This [c]ourt heard credible evidence presented by CUA Case Manager, Ms. Keisa Walden, who opined that [Child] would not suffer irreparable harm if Mother's parental rights were terminated because [Child] does not know or recognize Mother as her parent. She has only seen [Child] [three] times in 2017. A pre-adoptive home is being explored for [Child] that would meet all of her medical needs. The medical pre-adoptive foster parent, a nurse, has visited with [Child] and has received medical training. The Court found credible the evidence that [Child] was not bonded to Mother. Therefore, this Court reasoned that [Child] would not suffer irreparable harm if Mother's parental rights were terminated, and that termination meets the developmental, physical, and emotional needs and welfare of [Child].

Trial Ct. Op., 11/21/17, 26-27; *see also* N.T, 9/7/17, at 50-51.

Upon review, the record supports the trial court's finding that termination meets the developmental, physical, and emotional needs and welfare of Child. Further, the trial court heard credible evidence that, despite Mother's assertion to the contrary, Child did not recognize Mother and would suffer no irreparable harm from termination. N.T., 9/7/17, at 50. Our standard of review requires us to accept the trial court's findings of fact and credibility determinations where, as here, they are supported by the record.

***See In re T.S.M.***, 71 A.3d at 267.  Accordingly, we decline to reweigh the evidence and reassess witness credibility.[3]

In sum, our review of the record supports the trial court's conclusion that DHS met its statutory burden of proving by clear and convincing evidence that Mother's parental rights should be terminated pursuant to 23 Pa.C.S. 2511(a)(1) and 2511(b).  Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/6/18

---

[3] To the extent Mother asserts DHS interfered with her ability to visit and bond with Child, we have indicated previously that there is no requirement for the court to consider "reasonable efforts" by the agency.  ***See In the Interest of D.C.D.***, 105 A.3d at 672.  In any event, we discern no support for Appellant's contention that DHS severely compromised her ability to visit with Child when Child was in Bucks County receiving medical care.  Mother testified that although she was provided with bus tokens, she never tried to use the bus to visit her daughter.  N.T., 9/7/17, at 83.

- 14 -